TM:AES

15 MISC 178

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - X

IN THE MATTER OF AN APPLICATION OF THE UNITED STATES OF AMERICA FOR AN ORDER AUTHORIZING THE RELEASE OF HISTORICAL CELL-SITE INFORMATION

APPLICATION

- - - - - - - - - - - - - - - - - - - - X

Alixandra E. Smith, an Assistant United States Attorney for the Eastern District of New York, hereby applies to the Court for Orders pursuant to 18 U.S.C. § 2703(c)(1) and (d), directing that within seven days Sprint (the "service provider") disclose recorded information identifying the base station towers and sectors that received transmissions from the following telephones, as follows: (347) 732-7692 ("SUBJECT TELEPHONE 1") and (347) 304-2706 ("SUBJECT TELEPHONE 2") (collectively, the "SUBJECT TELEPHONES"), at the beginning and the end of calls or text message or data transmissions, and the mobile switching center serving the SUBJECT TELEPHONES during any calls or text message or data transmissions, and any and all data that shows an approximate range of the SUBJECT TELEPHONES from the towers being utilized (example, range to tower data), for the period August 15, 2011 to August 25, 2011 (collectively, the "HISTORICAL CELL-SITE INFORMATION").

In support of this application I state the following:

1. I am an Assistant United States Attorney in the Office of Loretta E. Lynch, United States Attorney for the Eastern District of New York. As such, I am a duly-authorized representative of a "governmental entity" under 18 U.S.C. § 2703(c) and (d)

and, as such, am authorized to apply for Orders authorizing the disclosure of the HISTORICAL CELL-SITE INFORMATION.

2. The Court is authorized to order the disclosure of the HISTORICAL CELL-SITE INFORMATION upon the government offering specific and articulable facts showing that there are reasonable grounds to believe that the information sought is relevant and material to an ongoing criminal investigation. 18 U.S.C. § 2703(d).

3. I have discussed this matter with the Federal Bureau of Investigation (the "investigative agency"), who is involved in the investigation. Based upon my discussion with the investigative agency, I believe that the information likely to be obtained is relevant to an ongoing criminal investigation as required by 18 U.S.C. § 2703(d). First, the investigative agency is conducting a criminal investigation into possible violations of federal criminal laws, including conspiracy to commit murder-in-aid of racketeering, in violation of 18 U.S.C. § 1959(a)(1), conspiracy to commit murder while engaged in a narcotics trafficking offense, in violation of 21 U.S.C. § 848, murder through the use of a firearm, in violation of 18 U.S.C. § 924(j), and conspiracy to distribute heroin, cocaine base, cocaine and marijuana, in violation of 21 U.S.C. § 846, among others, occurring in the Eastern District of New York and elsewhere. Second, it is believed that PAUL RIVERA and MICHAEL GARRETT, and others known and unknown, have used the SUBJECT TELEPHONES in furtherance of the above offenses. Third, HISTORICAL CELL-SITE INFORMATION will further the investigation by providing leads regarding the location of RIVERA, GARRETT and others during the course of the conspiracy and specifically, before, during and after the murder of Robert Barber, which was committed on August 22, 2011, as part of the conspiracy; identifying the locations of the SUBJECT TELEPHONES in order to confirm the identity of

their users; providing evidence regarding the means by which RIVERA and GARRETT participated in the conspiracy; and identifying other coconspirators.

4. Based upon discussions with a special agent of the investigative agency, the government hereby sets forth the following specific and articulable facts showing that there are reasonable grounds to believe that the information sought is relevant and material to an ongoing criminal investigation.

a. RIVERA, also known as "Paul Zance," "Paulee Zance," "Paulie Rivera," "Edgar Rivera," "Zance Rivera" and "Steven Rivera," and GARRETT, also known as "Rab" and "Roger Rabbit," are the founders and leaders of a Brooklyn-based gang and rap group known as "Together Forever" and the "TF Mafia" (referred to herein as "TF"). TF Mafia has been involved in narcotics trafficking, forced prostitution, gang activity and related violence in the Brownsville neighborhood of Brooklyn, New York, an area victimized by a high rate of gang and drug-related violent crime.

b. The investigation into the activities of TF Mafia was initiated by a traffic stop in Pennsylvania that occurred on January 18, 2012. On that date, RIVERA and GARRETT, together with other members of TF, left Brooklyn, New York, to travel to Binghamton, New York, via Scranton, Pennsylvania, in order to traffic narcotics and to transport several females for the purpose of prostitution. RIVERA was the driver of a vehicle that contained an individual referred to as "Young John," and three females, including a 14 year-old girl (collectively referred to herein as the "Stopped Vehicle Occupants"). The vehicle that was driven by RIVERA was stopped as a result of a traffic violation in Lennox Township, Pennsylvania. During the traffic stop, RIVERA provided false information to a law enforcement officer about his criminal history, as well as conflicting information about the

nature and purpose of his trip. Following a canine sniff search, a search warrant was obtained for the vehicle from a judge in Susquehanna County, Pennsylvania. A subsequent search of the vehicle yielded approximately 170 grams of cocaine; 170 glassine bags containing a total of approximately 7.5 grams heroin; and a small amount of marijuana.

c. Meanwhile, GARRETT was traveling in another car to Pennsylvania, along with a camera crew. Pursuant to a subpoena, the government has obtained a documentary that was produced at GARRETT's direction by a film company. The documentary includes footage related to the car stop, and statements by GARRETT. Specifically, in a portion of the video set in Scranton, Pennsylvania immediately following the stop, Garrett states: "It's the 18th. Homie Zance, Homie Yung, Kathy, Shelby and uh, Shorty [UI]. They all locked up. [UI] They got locked up this morning so it's a bad day for the team. Too many mistakes make me look bad." In subsequent portions of the video, Garrett is seen on camera arranging for a lawyer to represent all of the individuals arrested in the car; asking that attorney to confirm that "nobody is talking on nobody"; sending his girlfriend to jail to meet with the individuals who were in the car; and discussing with his girlfriend her trip to the jail to ensure that none of the individuals had made any statements to law enforcement. Based on that video footage, and information provided by cooperating witnesses and victim witnesses, the investigation has revealed that GARRETT was the leader of TF's drug distribution activities.

d. Specifically, the investigation revealed that GARRETT has prior federal felony convictions for possessing cocaine base with the intent to distribute it and a related firearms charge, which resulted in his incarceration from 2001 to 2007. Following GARRETT's release from prison in 2007, he reestablished a drug distribution network with

many of the same individuals — largely TF members — who had helped him distribute drugs prior to his incarceration. This network had bases in various neighborhoods in Brooklyn, New York, as well as Scranton, Pennsylvania, and distributed crack cocaine, heroin, cocaine and marijuana. At his residence on Stanley Avenue in Brooklyn, GARRETT cooked and packaged crack cocaine; other drugs were packaged at other locations in Brooklyn.

e. One of the points of distribution in Brooklyn was a tattoo shop run by RIVERA in the Brownsville neighborhood, at 361-B Sutter Avenue where TF members, including RIVERA, served as distributors. GARRETT also directed the trafficking of drugs from Brooklyn to Scranton, where he was able to get higher prices for drugs. GARRETT and RIVERA often used females to move drugs and money to and from various locations. GARRETT also used violence to keep his workers in line, as well as to protect TF s drug territory.

f. In addition, the investigation into TF Mafia revealed RIVERA and GARRETT's participation in the murder of a rival narcotics trafficker, Robert Barber, on August 22, 2011. In the summer of 2011, GARRETT was distributing significant quantities of drugs in the neighborhood around RIVERA's tattoo shop. At some point, GARRETT spoke to one of his distributors, a TF member and cooperating witness ("CW-1")[1] about Barber, also known as "Crowbar" or "Stink," who was a member of the Crips. CW-1 vouched for Barber with GARRETT, who subsequently gave Barber some drugs for him to sell. Barber then asked GARRETT for more drugs to sell, and GARRETT told Barber that he

[1] CW-1 has signed a cooperation agreement with the government pursuant to which CW-1 pled guilty to conspiracy to distribute and possess with intent to distribute narcotics, and using, carrying and possessing a firearm in furtherance of such conspiracy; CW-1 hopes to obtain leniency at sentencing.

would need to pay him for the drugs that GARRETT had already provided before GARRETT would give him any additional drugs. CW-1 subsequently observed an argument between GARRETT and Barber near the tattoo shop about the situation, during which Barber threatened to prevent GARRETT and his workers from selling drugs in the neighborhood.

g. At some point in late July or early August 2011, another TF member and cooperating witness ("CW-2")[2] observed a conversation between GARRETT and RIVERA at the tattoo shop. GARRETT told RIVERA how an individual (later determined to be Barber) had threatened that TF could no longer sell drugs on the block. GARRETT was angry, and told RIVERA that they needed to kill the individual; GARRETT also stated that he needed to pay someone to do it. That same night, GARRETT provided RIVERA with a silver .380 caliber handgun.

h. On the evening of August 22, 2011, CW-2, RIVERA and others were in the tattoo shop, when RIVERA observed Barber on the street from a monitor in the tattoo shop that displayed video from the security cameras outside the building. RIVERA ran to the back of the shop and then downstairs to the sidewalk. At approximately 9:09 p.m., surveillance footage from the grocery store directly beneath the tattoo shop shows RIVERA exit the shop onto the sidewalk. The surveillance footage shows RIVERA speaking on his cell phone, pacing back and forth, and saying hello to other individuals on the sidewalk. The footage also shows RIVERA looking across the street.

[2] CW-2 has signed a cooperation agreement with the government pursuant to which CW-2 pled guilty to conspiracy to distribute and possess with intent to distribute narcotics; CW-2 hopes to obtain leniency at sentencing. CW-2 has a criminal history involving drug trafficking, drug use and other crimes, including a crime of violence.

i. CW-2 went downstairs to speak to RIVERA, and noticed the silver .380 caliber handgun that GARRETT had provided to RIVERA sitting on a ledge near the door. RIVERA asked CW-2 to hand him the gun; RIVERA then fired the gun one time in Barber's direction across the street. The bullet hit Barber in the upper abdomen. Barber was conscious when an ambulance arrived on the scene shortly thereafter; he was given initial treatment, and then transported to Brookdale Medical Center in Brooklyn, New York. Despite multiple surgeries, the medical staff at the hospital was unable to save Barber, who died during surgery. The autopsy report later concluded that the cause of death was homicide, and that the bullet had taken a downward left-to-right trajectory, severing Barber's aorta and perforating his bowel, and causing massive internal bleeding.

j. On August 22, 2012, one year after the shooting, a search warrant was executed at the tattoo shop at 361-B Sutter Avenue. Among the items recovered from inside a closet door in the shop were a silver slide for a .380 caliber semi-automatic pistol, a .380 caliber semi-automatic ammunition round and a gray magazine for a .380 automatic pistol containing four .380 rounds.

k. The investigative agency has conducted an analysis of the SUBJECT TELEPHONES, and has determined the following:

i. SUBJECT TELEPHONE 1 was subscribed to by RIVERA between January 2007 and May 2012, and was in RIVERA's possession on January 18, 2012, when he was arrested in Susquehanna, Pennsylvania. A search warrant was subsequently obtained and executed for SUBJECT TELEPHONE 1. Among the contacts in SUBJECT TELEPHONE 1 was a phone number for "Crowbar" ("VICTIM PHONE"), an alias for Barber. Another contact in SUBJECT TELEPHONE 1 was SUBJECT TELEPHONE 2,

which was listed under the name "Rab," an alias for GARRETT. An analysis of phone records reveals that SUBECT TELEPHONE 1 and SUBJECT TELEPHONE 2 communicated multiple times on the night of August 22, 2011 and in the early morning hours of August 23, 2011. Several minutes before the shooting on August 22, 2011, SUBJECT TELEPHONE 1 placed a call to SUBJECT TELEPHONE 2 that lasted 39 seconds, and then immediately received a call from SUBJECT TELEPHONE 2 that lasted 23 seconds. Then, several minutes after the shooting, SUBJECT TELEPHONE 1 placed a call to SUBJECT TELEPHONE 2 that lasted 205 seconds. Over the next three hours, six additional calls were made between the two phones. In addition, toll records show that, following the shooting, SUBJECT TELEPHONE 1 placed and received calls from a variety of phone numbers at regular intervals (ranging from a few minutes to twenty minutes) well into the next morning. Specifically, between the time of the shooting (approximately 9:10 p.m. on August 22, 2011) and 9:00 a.m. on August 23, 2011, RIVERA placed and received approximately 70 phone calls.

ii. As noted above, SUBJECT TELEPHONE 2 was listed as a contact for "Rab" in SUBJECT TELEPHONE 1. SUBJECT TELEPHONE 2 was subscribed to by an individual other than GARRETT. An analysis of phone records reveals that — in addition to the phone calls between SUBJECT TELEPHONE 1 and SUBJECT TELEPHONE 2 around the time of Barber's murder — SUBJECT TELEPHONE 2 was in contact with the VICTIM PHONE six times on August 20, 2011 and August 21, 2011.

5. Based upon the above proffer, the government requests that the Court issue an Order that provides, pursuant to 18 U.S.C. § 2703(c)(1) and (d), a directive to the

service provider to supply within seven days the requested HISTORICAL CELL-SITE INFORMATION.

6. The government also requests that the service provider, and any other person or entity whose assistance is used to facilitate execution of the Orders be ordered not to disclose (a) the existence of the Order of Authorization; (b) the existence of the Order to Service Provider and (c) the production of the HISTORICAL CELL-SITE INFORMATION, to the listed subscribers for the SUBJECT TELEPHONES, the subscribers of the telephones initiating incoming calls to or receiving outgoing calls from the SUBJECT TELEPHONES, or to any other person, unless and until otherwise ordered by the Court. Any such disclosure might cause a target to flee from prosecution or result in the destruction of or tampering with evidence.

7. No prior request for the relief set forth herein has been made. The foregoing is affirmed under the penalties of perjury. See 28 U.S.C. § 1746.

Dated: Brooklyn, New York
January 30, 2015

Alixandra E. Smith
Assistant United States Attorney
(718) 254-6370

15 MISC 178

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

\- - - - - - - - - - - - - - - - - -X

IN THE MATTER OF AN APPLICATION OF THE UNITED STATES OF AMERICA FOR AN ORDER AUTHORIZING THE RELEASE OF HISTORICAL CELL-SITE INFORMATION

ORDER OF AUTHORIZATION

\- - - - - - - - - - - - - - - - - -X

This matter having come before the Court pursuant to an application by Assistant United States Attorney Alixandra E. Smith, an attorney for the Government as defined by Rule 1(b)(1) of the Federal Rules of Criminal Procedure and a duly-authorized representative of a "governmental entity" under 18 U.S.C. § 2703(c) and (d), requesting Orders pursuant to 18 U.S.C. § 2703(c)(1) and (d), directing that within seven days Sprint (the "service providers") disclose recorded information identifying the base station towers and sectors that received transmissions from (347) 732-7692 ("SUBJECT TELEPHONE 1") and 347-304-2706 ("SUBJECT TELEPHONE 2") (collectively, the "SUBJECT TELEPHONES"), at the beginning and the end of calls or text message or data transmissions, and the mobile switching center serving the SUBJECT TELEPHONES during any calls or text message or data transmissions, and any and all data that shows an approximate range of the SUBJECT TELEPHONES from the towers being utilized (example, range to tower data), for the period August 15, 2011 to August 25, 2011 (collectively, the "HISTORICAL CELL-SITE INFORMATION");

UPON REVIEW OF THE APPLICATION, THE COURT HEREBY FINDS THAT:

Pursuant to 18 U.S.C. § 2703(c)(1) and (d), the government has offered specific and articulable facts showing that there are reasonable grounds to believe that the HISTORICAL CELL-SITE INFORMATION is relevant and material to an ongoing criminal investigation into possible violations of federal criminal laws, including conspiring to obstruct, delay, or affect commerce or the movement of any article or commodity in commerce by robbery or extortion, and committing or threatening physical violence to any person or property in furtherance of such a conspiracy, in violation of 18 U.S.C. § 1951, occurring in the Eastern District of New York and elsewhere, such investigation having been and being conducted by the Federal Bureau of Investigation (the "investigative agency"); now therefore,

IT IS HEREBY ORDERED, pursuant to 18 U.S.C. § 2703(c)(1) and (d), that the service providers shall supply to the investigative agency within seven days the HISTORICAL CELL-SITE INFORMATION for the period August 15, 2011 to August 25, 2011.

Dated: Brooklyn, New York
January 30, 2015

THE HONORABLE ROANNE MANN
UNITED STATES MAGISTRATE JUDGE
EASTERN DISTRICT OF NEW YORK

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

15 MISC 178

\- - - - - - - - - - - - - - - - - -X

IN THE MATTER OF AN APPLICATION OF THE UNITED STATES OF AMERICA FOR AN ORDER AUTHORIZING THE RELEASEOF HISTORICAL CELL-SITE INFORMATION

\- - - - - - - - - - - - - - - - - -X

ORDER TO
SERVICE PROVIDER

WHEREAS this Court has, upon the application of the United States of America, entered an Order pursuant to 18 U.S.C. § 2703(c)(1) and (d), directing that within seven days Sprint (the "service provider") disclose recorded information identifying the base station towers and sectors that received transmissions from (347) 732-7692 ("SUBJECT TELEPHONE 1") and 347-304-2706 ("SUBJECT TELEPHONE 2") (collectively, the "SUBJECT TELEPHONES"), at the beginning and the end of calls or text message or data transmissions, and the mobile switching center serving the SUBJECT TELEPHONES during any calls or text message or data transmissions, and any and all data that shows an approximate range of the SUBJECT TELEPHONES from the towers being utilized (example, range to tower data), for the period August 15, 2011 to August 25, 2011 (collectively, the "HISTORICAL CELL-SITE INFORMATION");

NOW, THEREFORE, IT IS HEREBY:

ORDERED, pursuant to 18 U.S.C. § 2703(c)(1) and (d), that the service provider shall supply within seven days the HISTORICAL CELL-SITE INFORMATION for

the periods August 15, 2011 to August 25, 2011 (collectively, the "HISTORICAL CELL-SITE INFORMATION").

Dated: Brooklyn, New York
January 30, 2015

THE HONORABLE ROANNE MANN
UNITED STATES MAGISTRATE JUDGE
EASTERN DISTRICT OF NEW YORK